**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**BABACK KERMANSHAHI a/k/a BOB KERMANSHAHI,**
Plaintiff, Pro Se,

v.

**AMAZON WEB SERVICES, INC.,**
Defendant.

**Case No.: 1:26-cv-03534-JAV-RFT**

**FIRST AMENDED VERIFIED COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff, Baback Kermanshahi, appearing pro se, for his First Amended Complaint against Defendant AMAZON WEB SERVICES, INC., respectfully alleges as follows:

## I. NATURE OF THE ACTION

1. This civil action seeks compensatory damages, back pay, front pay, punitive damages, and equitable restitution arising from Defendant's violations of the New York State Human Rights Law (N.Y. Exec. Law § 296) and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 et seq.).

2. Between 2024 and 2026, Defendant utilized performance management tools to penalize Plaintiff for symptoms associated with Plaintiff's documented disabilities.

3. Following a January 28, 2026 corporate Reduction in Force (RIF), Defendant placed Plaintiff on an inactive medical leave, maintained a disciplinary profile block, and refused to hold a cooperative dialogue regarding Plaintiff's accommodation requests. These actions prevented Plaintiff from accessing internal transition period privileges.

4. Defendant's continuous failure to accommodate, culminating in Plaintiff's separation on June 9, 2026, severely exacerbated Plaintiff's physical and neurological conditions. Defendant's actions resulted in Plaintiff suffering a permanent, total medical disability, thereby destroying Plaintiff's professional livelihood and future earning capacity.

5. Explicit ERISA Preemption Disclaimer: Plaintiff explicitly disclaims any causes of action under the Employee Retirement Income Security Act (ERISA). Plaintiff does not seek to recover plan benefits, enforce rights under the terms of an ERISA plan, or clarify rights to future benefits. Plaintiff pleads references to Defendant's actions regarding Plaintiff's Long-Term Disability (LTD) or Short-Term Disability (STD) claims strictly as factual evidence of Defendant's discriminatory conduct, materially inaccurate record-keeping, and underlying motivations under the NYSHRL and NYCHRL.

## II. PARTIES AND JURISDICTION

6. Plaintiff BABACK KERMANSHAHI is a resident of the State of New Jersey and is a person with disabilities, possessing documented clinical diagnoses of Autism Spectrum Disorder Level 1 (ASD 1) and a Specific Learning Disability (SLD). Furthermore, Plaintiff suffers from severe physical and organic neurological symptoms consistent with a post-viral cognitive disorder (Long COVID), causing disabling executive dysfunction, memory deficits, and physiological stamina limitations. These conditions subsequently progressed, rendering Plaintiff permanently and totally disabled from all competitive employment as of July 2026.

7. Defendant AMAZON WEB SERVICES, INC. (AWS) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of Washington. Defendant maintains administrative and payroll operations directing the

employment terms and transition benefits of Plaintiff from the JFK27 Corporate Office at 424 5th Avenue, New York, NY 10018. Plaintiff is based out of the JFK27 location.

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction), as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). The basis of venue is the locus of the discriminatory acts and the administrative control of Plaintiff's employment records and benefits within New York County.

10. Procedural Requirements (Election of Remedies): In July 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) covering the events of the 2024–2025 timeline [Exhibit PX-35]. When filing this EEOC Charge, Plaintiff expressly directed the EEOC not to dual-file or cross-file the Charge with the New York State Division of Human Rights (SDHR) or the New York City Commission on Human Rights (NYCCHR). Plaintiff executed this directive specifically to avoid triggering the Election of Remedies doctrine under N.Y. Exec. Law § 297(9) and N.Y.C. Admin. Code § 8-502(a), thereby preserving this Court's jurisdiction over the state and city claims.

## III. FACTUAL ALLEGATIONS

### A. 2025 Pre-RIF Conduct and Performance Management Initial Disclosures and Performance Reviews (Nov 2024 - Q1 2025)

11. In November 2024, Plaintiff disclosed his writing-impacted disability to his new manager, David Milam. David Milam responded to this disclosure by stating, "yeah, writing is hard," and did not offer or initiate a process for accommodations.

12. Between January and February 2025, Plaintiff and a non-disabled peer, Nicole Owens, both authored mechanism documents. David Milam published Plaintiff’s document to the public corporate folder for internal customer access. Subsequently, David Milam deemed Plaintiff's document "unaccepted" and a failure, while maintaining the acceptance of Nicole Owens' published document [Exhibit PX-38].

13. In Plaintiff's Q1 2025 Forte performance review, Manager David Milam issued Plaintiff a "Needs Improvement" rating for the 2024 calendar year. To support this negative 2024 rating, Milam evaluated incomplete document drafts that Plaintiff had prepared in early 2025. This rating factually contradicted Plaintiff's documented completion of his 2024 KPI targets and his January 2025 successful exit from a coaching plan under his prior manager, Jay Coblentz [Exhibits PX-34, PX-47].

14. In April and May 2025, Plaintiff filed formal internal complaints regarding David Milam's conduct to HR investigators Reshma Samineni and Sacha Wilson [Exhibit PX-38].

**The 'Focus' Plan and Accommodations (March - May 2025)**

15. On March 28, 2025, Defendant placed Plaintiff on a "Focus" performance plan. Manager Steve Brodie delivered the plan. Manager David Milam authored the primary metrics and inputs for this plan. Prior to the issuance of this plan, Plaintiff had explicitly complained to HR and Director Pat Combes regarding David Milam's conduct and requested a reassignment to Steve Brodie away from David Milam [Exhibit PX-38].

16. The Focus plan required Plaintiff to meet specific deliverables by May 5, 2025. Plaintiff requested accommodations for his disability to complete these deliverables.

17. Defendant approved these accommodations on May 1, 2025 [Exhibit PX-39]. Defendant did not extend the Focus plan timeline to allow Plaintiff to utilize the approved accommodations [Exhibits PX-40, PX-46].

**The Internal Audit Investigations (April - May 2025)**

18. In late April and early May 2025, Plaintiff initiated a formal internal audit regarding Manager David Milam's conduct.

19. On April 30, 2025, Plaintiff provided Investigator Reshma Samineni with a written timeline of the behavior and a list of corroborating witnesses [Exhibit PX-43].

20. On May 6, 2025, Plaintiff completed an initial intake interview with Investigator Samineni. Defendant transparently logged this investigation under official Case Number 20250422-1484427.

21. Immediately after Plaintiff provided the documented history of behavior, Defendant abandoned Case-20250422-1484427. Defendant did not notify Plaintiff that the investigation was closed and did not issue findings or determinations.

22. This closure induced a three-week delay in the investigation process while Plaintiff was subjected to the limited-duration "Focus" performance plan.

23. On May 26, 2025, Defendant required Plaintiff to submit to a new intake interview and restart the audit process with a different investigator, Sacha Wilson. Investigator Sacha Wilson declined Plaintiff's request to provide an official administrative case number, stating the new audit case number was "confidential."

24. On May 28, 2025, Plaintiff transmitted a formal written communication to Investigator Sacha Wilson containing the detailed timeline of the behavior, a list of witnesses to the events, and a specific request for relief [Exhibit PX-38]. Within this communication, Plaintiff formally requested the exact administrative correction of his 2024 performance rating, but Defendant refused to correct the factual discrepancy [Exhibit PX-38].

**The Return to Work and Document Review (August 2025)**

25. The unaccommodated Focus plan resulted in Plaintiff taking medical leave in May 2025. HR Representative Stephanie Arriero documented in writing that Plaintiff's Focus plan was extended into August 2025 to accommodate his return [Exhibit PX-42].

26. Plaintiff returned to active work on August 18, 2025. During this August period, Plaintiff requested to use his approved accommodation requiring his manager to review his document outline prior to final submission.

27. Manager Steve Brodie withheld feedback on the outline until September 8, 2025—exactly one day before the Focus 2025 final document review meeting Mr. Brodie had set. Plaintiff did not have the time to rewrite the document and conduct additional peer review sessions prior to the review with Mr. Brodie.

**The September 9 Meeting**

28. On September 9, 2025, Plaintiff attended a scheduled meeting with Manager Steve Brodie to review the finalized document due under the 2025 Focus plan. Mr. Brodie informed Plaintiff HR Partner Kathryn Dube would be joining the call.

29. Manager Steve Brodie and HR Partner Kathryn Dube converted the document review meeting into a disciplinary "Pivot" plan meeting. Defendant did not review the document Plaintiff authored between August 18 and September 8 [Exhibit PX-12].

30. The written Pivot plan issued on September 9, 2025, cited Plaintiff's failure to meet the requirements of the original April/May Focus plan [Exhibit PX-12]. Defendant placed Plaintiff on a 'Pivot' performance plan based on a Q1 2025 review authored by Manager David Milam. In this review, Defendant explicitly penalized Plaintiff for written communication challenges that are documented symptoms of Plaintiff’s Autism Spectrum Disorder Level 1 and Specific Learning Disability.

31. The Pivot documentation stated Plaintiff failed the plan prior to his May medical leave, contradicting HR Representative Stephanie Arriero's written documentation that the Focus plan was extended into August [Exhibit PX-42].

32. Defendant utilized the unaccommodated March 28 - May 5 Focus Plan status as the basis for the Pivot plan, and did not utilize Plaintiff's work after his return from medical leave on August 18 [Exhibit PX-12]. Defendant issued the Pivot plan relying on work performed during a period when Defendant had denied Plaintiff's medically mandated editorial accommodation.

**B. Medical Leaves and Pre-RIF Wage Deficits (May 2025 – February 2026)**

33. The actions of Manager David Milam, Manager Steve Brodie, and HR Partner Kathryn Dube exacerbated Plaintiff’s documented disabilities. This clinical deterioration manifested as profound organic cognitive deficits, neurological exhaustion, and systemic physical fatigue, requiring clinical intervention via two Intensive Outpatient Programs (IOP) and consecutive periods of medical leave [Exhibits PX-37, PX-41].

34. Throughout the 2025 and early 2026 timelines, Plaintiff reasonably believed his profound cognitive fatigue, executive dysfunction, and systemic physiological limitations were exclusively attributable to severe autistic burnout induced by the aforementioned performance management plans and workplace conduct.

35. However, because Plaintiff’s profound symptoms failed to improve despite clinical intervention and extended rest, Plaintiff underwent advanced neurological evaluations. In July 2026, Plaintiff's treating neurologist informed Plaintiff that his chronic, unremitting neurological deficits and stamina limitations are clinically indicative of an organic, post-viral condition consistent with Long COVID.

36. Plaintiff required an initial medical leave from May 5, 2025, to August 18, 2025, and a subsequent continuous medical leave from September 12, 2025, to February 2, 2026 [Exhibit PX-37].

37. During these medical leaves, Defendant's Short-Term Disability policy compensated Plaintiff at 60% of his standard salary and ceased Defendant's 2% 401(k) company matching contributions.

38. Plaintiff’s regular base salary was $4,873.08 per week ($253,400 annually). Defendant's policy caused Plaintiff a wage deficit equal to 40% of his normal weekly wage ($1,949.23), plus the loss of the $97.46 weekly 401(k) match, totaling a $2,046.69 economic deficit for every week spent on approved disability leave.

39. Applying this $2,046.69 deficit to the leave periods, combined with two full weeks of wholly unpaid wages and lost 401(k) match ($9,941.08) prior to February 2, 2026, Defendant's actions

resulted in an exact deficit of $82,741.84 in pre-RIF short-term disability economic losses [Exhibit PX-37].

40. On June 9, 2026, Plaintiff’s timecard was updated to reflect a reduced schedule of 20 hours per week for the period of February 2 through April 28. Plaintiff requested that Defendant reconcile his wage statements to match the 20 hours recorded on the finalized timecards. Defendant did not meet its stated Service Level Agreement (SLA) of three business days to resolve this ticket [Exhibit PX-22, Exhibit PX-45].

41. Plaintiff's medical leaves and subsequent capacity restrictions were necessitated by severe, ongoing physical and neurological symptoms, including profound cognitive fatigue and executive dysfunction. These organic, non-psychiatric limitations strictly capped Plaintiff's capacity to perform work at a maximum of 20 hours per week during the transition period, rendering Plaintiff functionally and legally disabled from full-time employment.

42. Between February and April 2026, Defendant continually processed Plaintiff’s payroll at 100% capacity (40 hours per week) despite possessing medical certifications restricting Plaintiff to a 50% capacity (20 hours per week). Plaintiff explicitly notified Defendant via internal Payroll Case 624349869051 and direct emails to Disability and Leave Services (DLS) that this coding constituted a materially inaccurate administrative record [Exhibit PX-21].

43. On April 23, 2026, and April 27, 2026, DLS Operations Manager Emmanuel Ramirez issued written communications refusing to correct the payroll capacity error. Mr. Ramirez stated that Defendant "generally does not reduce pay for exempt employees who have reduced hours granted as a form of accommodation," and unilaterally declared the matter "closed" [Exhibit PX-10].

44. Defendant’s internal communications constitute direct admissions that Defendant maintained inaccurate administrative records despite possessing knowledge of Plaintiff’s medical restrictions. On July 7, 2026, Defendant’s Human Resources representative explicitly admitted in writing that Payroll could not correct Plaintiff’s wage discrepancies, stating: "Unfortunately, this cannot be done because the employee's standard working hours are set at 40 hours per week, even though the approved LOA is for 20 hours per week [Exhibit PX-45]."

45. Furthermore, Defendant's written communications establish that Defendant's unilateral generation of the unrequested Intermittent Leave of Absence (ILOA) mechanism structurally conflicted with a reduced schedule accommodation. On July 8, 2026, Defendant informed Plaintiff that under its ILOA policy, an employee taking 8 hours of leave is deemed absent for an entire shift, subjecting them to wage deductions. Defendant utilized this incompatible ILOA mechanism to penalize Plaintiff, erroneously claiming Plaintiff was "overpaid" for utilizing standard Paid Time Off (PTO) during this period and engaging a collections team against Plaintiff [Exhibit PX-45].

46. Defendant’s refusal to accurately code the 50% capacity restriction in its payroll system operated as a discriminatory administrative mechanism. Third-party providers rely strictly on capacity data provided by Amazon payroll to administer collateral employee programs. Defendant maintained an inaccurate 100% capacity data record and transmitted this inaccurate data to these third-party providers [Exhibit PX-7]. Defendant transmitted a 100% capacity data record to third-party providers despite possessing Plaintiff's 50% medical capacity restrictions.

**C. 2026 Protected Status, Medical Certifications, and the Uncontested Status Quo**

47. On January 23, 2026, Plaintiff submitted a "Certification of Health Care Provider" clearing Plaintiff to return to work with a strict restriction of 20 hours per week (50% physical capacity). Defendant logged this approval in Leave Case 11571708. [Exhibit PX-1, PX-2].

48. On January 27, 2026, Defendant issued formal written confirmation approving Plaintiff's return to work, accommodating the 50% capacity restriction effective February 2, 2026 [Exhibits PX-2, PX-25].

49. On February 27, 2026, Plaintiff submitted an updated medical certification extending the 20-hour per week restriction. Defendant registered this request as accommodation Claim AI-2026-1529422 [Exhibit PX-1].

50. On April 24, 2026, Plaintiff submitted a further updated medical certification extending the 20-hour per week restriction through August 2, 2026. Defendant registered this request as accommodation Claim AI-2026-1909404 [Exhibit PX-1].

**D. The Reduction in Force and Disciplinary "Pivot" Flag**

51. On January 28, 2026, Defendant announced a corporate Reduction in Force (RIF), eliminated Plaintiff's role, and initiated a 90-day non-working transition period originally scheduled to conclude April 28, 2026 [Exhibit PX-3].

52. At all times during the 2026 timeline, Plaintiff's capacity to perform work was strictly capped by medical professionals at a maximum of 20 hours per week due to permanent organic neurological deficits.

53. Defendant's transition policy guarantees the privilege to "apply and interview for other Amazon job opportunities" via the internal portal, as well as access to external outplacement services [Exhibits PX-3, PX-31].

54. On January 28, 2026, Defendant eliminated Plaintiff's active role during a Reduction in Force, rendering the completion of the Pivot plan structurally impossible [Exhibit PX-12].

55. On January 29, 2026, Defendant revoked Plaintiff's approved return-to-work status, blocked his system access [Exhibits PX-13, PX-18, PX-27], and placed Plaintiff onto an inactive medical leave [Exhibit PX-4].

56. Defendant maintained the Pivot transfer restriction, which is designed for active employees demonstrating improvement, while simultaneously placing Plaintiff on a non-working notice period due to role elimination. This configuration disabled Plaintiff's ability to execute "Informational Requests" or submit applications for open roles within the internal corporate network, effectively denying him the privileges of the transition period afforded to non-disabled peers [Exhibits PX-4, PX-32].

**E. Database Alterations and Leave Case Management**

57. Defendant separated Plaintiff's active Leave of Absence case from the underlying medical accommodation request (Case 12580044) and created accommodation Claim AI-2026-1797129 [Exhibit PX-7].

58. On February 5, 2026, Defendant placed Case 12580044 on an administrative hold, stating there was "no work to accommodate," and did not implement the previously approved 20-hour reduced schedule while the termination clock continued to run [Exhibit PX-6].

59. On April 17, 2026, Defendant issued an administrative accommodation "exception" granting a reduced schedule covering the period of April 8 to April 28 (subsequently updated through June 30) [Exhibit PX-5]. This exception did not address or grant approval for Plaintiff's specific medical accommodation requests submitted on January 23, February 27, March 14 or April 24.

60. On or about April 24, 2026, Defendant altered Plaintiff's "Last Working Day" in the internal system from April 28, 2026, to January 28, 2026 [Exhibits PX-3, PX-11]. Defendant did not alter the records of similarly situated, non-disabled comparators impacted by the exact same RIF.

61. On April 20, 2026, Defendant generated an unrequested Intermittent Leave of Absence (ILOA) case 13132448 [Exhibit PX-5]. Defendant instructed Plaintiff to log time for this ILOA case [Exhibit PX-26] but did not provide the input screen functionality in the portal. Defendant closed the case prior to the expiration of the 7-day reporting window [Exhibit PX-30], recording that Plaintiff was working at 100% capacity. Defendant refused to void or cancel case 13132448 [Exhibit-29] despite prior precedent where similar unrequested cases, Plaintiff's ILOA Case 12747379 had been administratively canceled [Exhibit PX-24].

**F. The March 14 Requests and the Cooperative Dialogue**

62. On March 14, 2026, Plaintiff formally requested a reasonable accommodation: the waiver of the administrative 'Pivot' transfer restriction to permit reassignment to a vacant internal role. Plaintiff also requested an administrative tolling of the transition timeline to account for his 50% medical capacity [Exhibit PX-8]. These accommodations were necessary to allow Plaintiff equitable access to outplacement services and HR transition privileges.

63. On March 17, 2026, Defendant categorized Plaintiff's three distinct March 14 accommodation requests as "duplicates" and stated they were addressed by the dormant Case 12580044 [Exhibit PX-5].

64. Between March 14 and March 27, Defendant delayed responses to Plaintiff by up to 15 days, consuming a total of 39 days of Plaintiff's 90 day transition period [Exhibit PX-20].

65. On March 27, 2026, Operations Manager Emmanuel Ramirez issued a written denial of all accommodations. Defendant summarily denied this accommodation. Defendant relied on a blanket corporate policy to enforce the transfer restriction, refusing to engage in an individualized cooperative dialogue to assess whether waiving the flag constituted an undue hardship [Exhibits PX-9, PX-10].

66. On June 9, 2026, Plaintiff submitted a written request to Defendant for the formal, written Final Letters of Determination regarding his outstanding accommodation requests, as required by the NYCHRL. Defendant did not provide these letters.

**G. State Court Representations, Separation, and Damages**

67. Defendant maintained a "Pivot" block on Plaintiff's internal employment profile throughout the transition period, which prevented Plaintiff from accessing the internal transfer portal. This administrative block denied Plaintiff the standard transition privileges afforded to other employees. By restricting this access, Defendant prevented Plaintiff from identifying, applying for, and securing reassignment to a vacant internal position compatible with his medically mandated 20-hour work week [Exhibits PX-14, PX-17, PX-19, PX-32].

68. On April 17, 2026, Defendant's outside counsel (Morgan Lewis) submitted a letter to the New York State Supreme Court opposing Plaintiff's request for a Temporary Restraining Order.

In this letter, Defendant stated it could not evaluate Plaintiff's reduced schedule accommodation request because Plaintiff was "not working" during the transition period [Exhibit PX-28]. Defendant further asserted it was awaiting "supporting documentation" from Plaintiff to assess a 50% reduced schedule [Exhibit PX-28].

69. Defendant's April 17, 2026 representations to the Court contradicted Defendant's concurrent administrative actions and existing records [Exhibit PX-23]. Defendant possessed Plaintiff's medical certifications submitted on January 23 and February 27 [Exhibit PX-1]. On April 17, 2026, Defendant issued a formal partial approval for Plaintiff's 50% reduced schedule accommodation from April 8 – April 28 [Exhibit PX-5]. Four days later, on April 21, 2026, Defendant approved the unrequested intermittent leave case, which required Plaintiff to actively log working timecards [Exhibit PX-5]. Defendant had no outstanding requests for medical documentation from Plaintiff on April 17, 2026, contradicting defendant's assertion to NYS Supreme Court Justice Headley supporting documentation was outstanding.

70. On April 17, 2026, the New York State Supreme Court entered a Temporary Restraining Order enjoining Defendant from effectuating Plaintiff's termination [Exhibit PX-16].

71. Defendant removed this action to this Court on April 29, 2026. The TRO lapsed on May 13, 2026.

72. Defendant placed Plaintiff's accommodations on an administrative hold during the transition period and ignored subsequent communications seeking compliance [Exhibits PX-22, PX-29]. Defendant separated Plaintiff on June 9, 2026, which terminated the timeframe required to hold a cooperative dialogue under the NYCHRL.

73. On August 29, 2022, Defendant awarded Plaintiff 940 Restricted Stock Units (RSUs) scheduled to vest on July 15, 2026 [Exhibit PX-44].

74. Defendant's published corporate policy mandates that when an employee works a reduced schedule as a medical accommodation, "vesting of stock-based awards will not be suspended, and unvested stock-based awards will not be canceled" [Exhibit PX-30].

75. Defendant’s administrative blocks, inactive leave placement, and refusal to engage in a cooperative dialogue obstructed Plaintiff from accessing the internal portal and transition privileges for a period of 90 days. Plaintiff requires the equitable reinstatement of these 90 lost transition days to restore the status quo.

76. Because Plaintiff’s documented medical condition strictly limits his working capacity to 50% (20 hours per week), Plaintiff requires an equitable tolling of the reinstated 90-day transition period. To afford Plaintiff the functional equivalent of 90 full-time days to complete company-directed transition activities, Defendant must extend the accommodated transition period over 180 calendar days. A 180-day transition period calculated from June 9, 2026. This 180-day accommodated period encompasses the July 15, 2026, RSU vesting date.

77. On June 9, 2026, Defendant effectuated the termination with the "Pivot" disciplinary flag active on Plaintiff's profile. Because the RIF disbanded Plaintiff's function, team and manager, the plan the Pivot plan could not be completed. The June 9 termination locked in this flag, resulting in a five-year hiring ban from Amazon [Exhibits PX-12, PX-15].

78. Following this June 9, 2026 termination, Defendant canceled Plaintiff's unvested 940 RSUs.

**IV. CAUSES OF ACTION**

**COUNT I: Disability Discrimination / Disparate Treatment (2025 Pre-RIF Conduct)**
*(Violations of NYCHRL § 8-107)*

79. Plaintiff repeats and realleges the foregoing paragraphs.

80. Manager David Milam stated Plaintiff's writing was "complex and difficult to understand," retroactively failed Plaintiff for 2024 metrics during the Q1 2025 Forte review [Exhibits PX-34, PX-47], and repeatedly prevented Plaintiff from speaking on customer calls. Defendant took these actions based on Plaintiff's documented disabilities.

**COUNT II: Hostile Work Environment (2025 Pre-RIF Conduct)**
*(Violations of NYCHRL § 8-107)*

81. Plaintiff repeats and realleges the foregoing paragraphs.

82. Manager David Milam engaged in conduct toward Plaintiff, captured in a March 7, 2025 audio recording, and separately witnessed by peers including Nicole Owens and Magnus Akesson [Exhibit PX-33]. This conduct contributed to Plaintiff suffering ASD related burnout, resulting in consecutive medical leaves spanning from May 2025 to February 2026 [Exhibit PX-37].

**COUNT III: Failure to Accommodate (2025 Pre-RIF Conduct)**
*(Violations of NYCHRL § 8-107(15))*

83. Plaintiff repeats and realleges the foregoing paragraphs.

84. Under N.Y.C. Admin. Code § 8-107(15)(a), Defendant was required to provide reasonable accommodations to enable Plaintiff to enjoy the rights and privileges in question.

85. Defendant delayed accommodation approvals until May 1, 2025. Defendant did not provide managerial coaching because Manager Steve Brodie was absent for two weeks of the plan.

86. Manager Steve Brodie and HR Partner Kathryn Dube denied Plaintiff's August 8, 2025 medically supported accommodation request for structural editing support [Exhibit PX-36]. Defendant offered volunteer peer reviews instead [Exhibit PX-36]. Manager Steve Brodie withheld feedback on a document outline until the day before a deadline. HR Partner Kathryn Dube proceeded with a "Pivot" ultimatum on September 9, 2025, while the medical accommodations remained unaddressed. In August 2025, Kathryn Dube confirmed extension of the Focus plan, however extension was not provided, and the plan was deemed a failure based on deadlines missed due to Plaintiff’s medical leave of absence in May 2025.

**COUNT IV: Failure to Engage in Cooperative Dialogue (2025 Pre-RIF Conduct)**
*(Independent Violation of NYCHRL § 8-107(28))*

87. Plaintiff repeats and realleges the foregoing paragraphs.

88. Defendant did not hold a cooperative dialogue regarding Plaintiff's 2025 accommodation requests. Specifically, Defendant did not hold a cooperative dialogue regarding the delayed May 1 approvals, the managerial review request, and the August 8 Dr. van Gorp letter [Exhibit PX-36].

**COUNT V: Retaliation (2025 Pre-RIF Conduct)**
*(Violations of NYCHRL § 8-107(7))*

89. Plaintiff repeats and realleges the foregoing paragraphs.

90. Plaintiff disclosed disability which impacted his writing (SLD) in November 2024, complained to Director Pat Combes in February 2025 on how he was being disability shamed and operating in a hostile environment, transmitted a formal written communication of conduct evidence to internal investigator Reshma Samineni on May 6, 2025 and Sacha Wilson on May 28, 2025 [Exhibit PX-38], and filed an EEOC Charge in July 2025 [Exhibit PX-35].

91. Manager Steve Brodie and HR Partner Kathryn Dube issued the March 28, 2025 "Focus" plan and the September 9, 2025 "Pivot" plan. Manager David Milam authored the primary inputs for the March "Focus" plan, which was based heavily on production of written documents. Defendant took these actions after Plaintiff engaged in the aforementioned activities.

**COUNT VI: Failure to Accommodate (2026 Conduct)**
*(Violations of NYSHRL § 296(3)(a) and NYCHRL § 8-107(15))*

92. Plaintiff repeats and realleges the foregoing paragraphs.

93. Under N.Y.C. Admin. Code § 8-107(15)(a), reasonable accommodations must be provided to enable a person with a disability to enjoy the rights and privileges in question. The 90-day RIF transition period carried guaranteed privileges of employment, including internal transfer process access, outplacement benefits, and confidential Informational discussion Requests with senior leaders.

94. Defendant did not grant the medically necessary reduced schedule accommodation requests originating from Plaintiff's medical certifications dated January 23, 2026 (Claim AI-2026-1797129), February 27, 2026 (Claim AI-2026-1529422), and April 24, 2026 (Claim AI-2026-1909404) according to the timelines and parameters specified by Plaintiff's physician.

95. The administrative accommodation "exception" issued by Defendant on April 17, 2026, granting a reduced schedule from April 8 to April 28 (and subsequently updated through June 30), did not address or grant approval for any of these specific accommodation requests, and Defendant provided no explanation as to why there was a discrepancy.

96. Defendant transmitted inaccurate 100% work-capacity data to third-party administrators, directly interfering with the adjudication of Plaintiff's collateral disability benefits. Defendant

enforced an unrestricted full-time payroll record to deny Plaintiff's requested accommodation of equitably tolling the transition period, thereby failing to accommodate Plaintiff's disability in violation of the NYCHRL [Exhibit PX-7].

**COUNT VII: Failure to Engage in Cooperative Dialogue (2026 Conduct)**
*(Independent Violation of NYCHRL § 8-107(28))*

97. Plaintiff repeats and realleges the foregoing paragraphs.

98. Defendant bundled and canceled Plaintiff's three distinct March 14 requests as duplicates and issued a written denial on March 27 without holding a cooperative dialogue [Exhibits PX-9, PX-10]. Furthermore, Defendant failed to engage in a cooperative dialogue for accommodation claims AI-2026-1797129, AI-2026-1529422, AI-2026-1909404 and HR case 246621707859.

99. Following Plaintiff's June 9, 2026 written request, Defendant failed to provide the statutorily mandated written Final Letters of Determination for Plaintiff's accommodation requests.

**COUNT VIII: Interference with Protected Rights (2026 Conduct)**
*(Violations of NYCHRL § 8-107(19))*

100. Plaintiff repeats and realleges the foregoing paragraphs.

101. Following Plaintiff's submission of medical certifications, Defendant made three specific alterations to Plaintiff's internal personnel record: (1) Defendant changed Plaintiff's "Last Working Day" to January 28, 2026; (2) Defendant opened and closed an Intermittent Leave of Absence (ILOA) case that Plaintiff did not request; and (3) Defendant recorded Plaintiff's work capacity at 100% in Payroll Case 624349869051 [Exhibit PX-21]. Following these specific system alterations, Defendant closed Plaintiff's pending accommodation requests without initiating a cooperative dialogue or providing written letters of determination. Plaintiff’s allegations regarding these internal record alterations relate solely to Defendant's obligations to

accommodate under the NYCHRL, and Plaintiff does not seek the recovery, denial, or enforcement of third-party ERISA disability benefits in this action.

**COUNT IX: Retaliation (2026 Conduct)**
*(Violations of NYSHRL § 296(7) and NYCHRL § 8-107(7))*

102. Plaintiff repeats and realleges the foregoing paragraphs.

103. Defendant terminated Plaintiff on June 9, 2026. Defendant altered Plaintiff's employment records. Defendant effectuated the termination with a structurally impossible "Pivot" flag to enact a five-year hiring ban [Exhibits PX-12, PX-15]. Defendant took these actions after Plaintiff requested medical accommodations.

**V. PRAYER FOR RELIEF**
WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and grant the following relief:

104. Compensatory Damages: Awarding Plaintiff compensatory damages to remedy economic and non-economic injuries, including: past lost wages incurred prior to separation; damage to professional reputation within the technology sector; and severe emotional distress caused by Defendant's continuous failure to accommodate and retaliatory actions.

105. Standalone Backpay and Economic Damages: Awarding Plaintiff a standalone, cumulative demand of $82,741.84 in pre-RIF Short-Term Disability economic deficits. This restitution for uncompensated wages and lost 401(k) matching incurred during the medical leaves from May 5, 2025, through February 2, 2026, remains separate from the alternative future remedies [Exhibit PX-37].

106. Primary Demand (Equitable Restitution / Value of Reinstatement & RSUs): An order directing Defendant to grant Plaintiff the financial and economic equivalent of an accommodated

transition period. This calculation is based on the 90 transition days lost to Defendant's obstruction, which, based on Plaintiff's documented 50% medical capacity at the time the accommodation was constructively denied, equitably tolls over a 180-calendar-day period. Calculated retroactively from the June 9, 2026 separation, this financial relief includes the equivalent compensation associated with the 940 RSUs expected to vest on July 15, 2026, and the value of lost employer-sponsored medical benefits for the 180-day period; or, alternatively, an order directing an inactive, non-working administrative reinstatement strictly to ensure Plaintiff enjoys equal benefit privileges—including active health coverage—and to allow the 940 RSUs, which were canceled upon the June 9, 2026 separation, to properly vest and be compensated for the 180-day period, without prejudice to Plaintiff's permanent medical disability status.

107. Equitable Correction of Employment Records: An order directing Defendants to expunge the discriminatory and retaliatory Q1 2025 Forte performance review from Plaintiff's personnel files, or alternatively, to rectify Plaintiff's historical employment records to eliminate the factually false performance discrepancies used to justify subsequent disciplinary actions. Defendant David Milam issued a "Needs Improvement" rating for the 2024 calendar year by improperly evaluating incomplete work Plaintiff performed in early 2025. This evaluation directly contradicted Plaintiff's documented completion of 2024 KPI targets and Plaintiff's successful January 2025 exit from a coaching plan under prior manager Jay Coblentz. Plaintiff formally requested this administrative correction internally on May 28, 2025, in a written communication to Defendant's investigator, but Defendants refused to correct the record [Exhibit PX-38]. This equitable rectification is necessary to remedy the post-employment reputational and

hiring barriers caused by the falsified record, to restore Plaintiff's accurate pre-discrimination employment profile, and to determine the proper baseline for backpay and economic damages.

108. Awarding Plaintiff compensatory civil rights damages under the NYSHRL and NYCHRL for the loss of future earning capacity in an amount to be determined at trial, estimated to exceed $3,400,000. Defendant's refusal to implement medically mandated schedule accommodations between February 2, 2026, and June 9, 2026, and Defendant's concurrent alterations of internal employment infrastructure, directly and proximately caused a severe clinical progression of Plaintiff's underlying neurological and physical conditions. This medical regression occurred subsequent to the constructive denials of accommodation, directly resulting in Plaintiff's total, permanent functional incapacitation from the competitive labor market following his June 9, 2026 separation.

109. Punitive Damages: Awarding Plaintiff punitive damages pursuant to the NYSHRL and NYCHRL.

110. Ministerial Remedial Correction: An order directing Defendant to correct its internal historical personnel records to accurately reflect Plaintiff's approved reduced-schedule accommodation from February 2, 2026, through June 9, 2026. This is a ministerial rectification of standard corporate employment fields to ensure historical accuracy for third-party reporting.

111. Attorney's Fees and Costs: Awarding Plaintiff reasonable attorney’s fees (should counsel be retained) and all costs of this action.

112. Further Relief: Granting such other and further relief as this Court deems just and proper.

**VERIFICATION**

I, Baback Kermanshahi, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 9, 2026 New York, New York

/s/Baback Kermanshahi
Baback Kermanshahi
Plaintiff Pro Se
732-213-9526
Mail.bob.k@gmail.com